LEADENHAM's, Ex'r. *vs.* NICHOLSON, *et al.*—June, 1827.

The lands of an intestate being incapable of a beneficial division, on the petition of his heirs, and by the order of the court of chancery, were sold, and the sale ratified, after this ratification, and as to part of the proceeds prior to any order or decree adjudging who was entitled thereto, one of the heirs, a married woman, died, her husband, who survived her, was a party to the petition, also died. *Held*, that the husband's representatives were not entitled to the wife's portion of that part of the proceeds of her father's estate, respecting which no order or decree of distribution had been passed at the time of the husband's death, but that it belonged to her personal representatives.

The representatives of a husband who survived his wife, are entitled to the *choses in action* of the wife, where the husband had either reduced them into possession, or obtained judgment for them at law or in equity, either in his own favour, or in favour of himself and wife.

In equity money directed to be laid out in land, will before investment, be considered as land; and land directed to be sold and converted into money, will, before a sale, be considered as money, and pass as such.

On an appeal from chancery, the appellate court decrees only in relation to the rights of those who are parties to the appeal.

APPEAL from the Court of Chancery. The nature of the case will sufficiently appear from the decree of the chancellor, and the statement made by the judge who delivered the opinion of this court.

BLAND, Chancellor, (September term, 1824,) It appears that *Joseph Williams* died seized in fee of about 175 acres of land, and having made no will, it descended, according to law, to his children, *Thomas, Joseph, Sarah* the wife of *Knighton, Mary* the wife of *Leadenham*, and *Elizabeth Ann Ball*, the granddaughter and heir of the intestate's daughter *Elizabeth*. The land being admitted to be incapable of division was ordered to be sold. *Thomas* became the purchaser at the sale; but, after giving bond for the purchase money, he sold the

whole, including the right to his own share, to *James Nichol-son*, who it was agreed should, as to all liability and benefit, exactly assume his place.   No notice was taken in the bill, nor in the answer, nor in the order of sale, nor in · the sale itself, of the fact, that *John Ball* the grandson of the intestate, and father of the defendant *Elizabeth Ann Ball*, had left a widow, who was entitled to dower in the undivided share which her husband had inherited from his grandfather.   But this circumstance, and the claim of *John Ball's* widow, who had become the wife of *Samuel Jones*, was, after the sale, brought before the court by their petition, in which they ask only for an equivalent out of the proceeds.   *Benjamin Welch*, having administered on the estate of *John Ball*, made sundry disbursements and payments in the course of his administration; and, on the final settlement of his accounts, it appeared that the assets and personal estate of *his* intestate had been wholly exhausted, and that he had overpaid.   Whereupon he came into court to ask for a reimbursement, *as a creditor*, out of so much of the proceeds of the real estate of his intestate as might be within reach of the court.   And, it being one of the ordinary and peculiar powers of this court, under such circumstances, to apply the *real* estate, after the *personal* had been exhausted, to the payment of the debts of the deceased owner, he was ordered to be paid accordingly.   It further appears, that sundry portions of the proceeds of the sale of the real estate of the intestate have been collected and distributed under the authority of the court; and that suits were brought, and judgments obtained by the trustee against the purchaser of the land, for the purchase money; when, in the spring of the year 1821, *Mary*, the wife of *Leaden-ham*, died without ever having had any issue; and in August of the same year her husband died.

The most important and leading question in this case is, whether so much of the proceeds of *Mary's* share of the land she inherited from her father, as was not collected and distributed, or actually paid over, shall descend or pass as the land itself would have gone, or, like personal property, be considered as vested in her husband, and be paid over to his representatives. The determination of this question must depend upon the effect which the proceedings of this court may have had, if any,

in producing a change in the nature of the estate of *Mary*. In the fee simple estate of *Mary*, her husband had no transmissible or permanent interest whatever; never having had issue by her, born alive, he could not have been tenant by the curtesy after her death. During the coverture he was merely the possessor and steward in right of his wife. The object of *Mary*, and her coheirs, in bringing their case before this court, was to have their respective portions given to them in severalty. And, in order to obtain this object, they consented, and the court awarded, that a sale should be made, and the proceeds brought into court to be divided. To effect this purpose .he court appointed a trustee, who it directed to sell, and in its order of sale, among other things, says "and on the ratification of the sale and receipt of the purchase money, *and not before*, the trustee shall, by a good deed acknowledged according to law, convey to the purchaser." In pursuance of this order the sale was made. Since this question has, in no instance, so far as I can learn, been directly decided, it must now be determined upon principle and by analogy.

Upon a writ of partition, according to the common law, there are two judgments. After the confession of the action, or issue tried for the plaintiff, there is a judgment *quod partitio fiat*, upon which a writ is issued, commanding the sheriff to make partition; which is done and returned to the court by him, and the twelve jurors under their hands and seals. Whereupon the final judgment of the court is, "therefore it is considered, that the aforesaid partition be holden firm and effectual forever, &c." This judgment, when made by writ, after the appearance of the party, shall not be defeated even though made against a *feme covert*, or though not equal, and any one of the parties be an infant. 2 *Sellon's Pr.* 222. In this case, it is evident, that the nature of the estate is not changed by the judicial proceedings until after the final judgment. And, until that point of time, the same consequences would ensue on the death of a joint tenant or parcener, as if no judicial proceedings had been commenced for the purpose of effecting a partition.

It is said by Lord *Redesdale*, that partition at law and in equity are different things. The first operates by judgment of

law, and delivery up of possession in pursuance of it, which concludes all the parties to it. Partition in equity proceeds upon conveyances to be executed by the parties; and if the parties be not competent to execute the conveyances, the partition cannot be effectually had. *Whaley vs Dawson, 2 Sch. & Lef.* 372. But the difference here spoken of clearly relates to the mode of proceeding, not to the stage of the judicial proceeding when the estate ceases to be joint and becomes an estate in severalty; as to which there is, evidently, no difference between the principles of law and equity. At law this mutation is effected by the final judgment, which is the last act of the court, when the parties are dismissed without further day in court, the whole object of the suit having been fully attained; so, too, in equity, when the conveyances are executed by the parties, and approved by the chancellor, there is an end of the suit, and the nature of the estate is finally and conclusively changed, and the court has no further power over the subject that had been submitted to it. Similar views of this matter seem to have been taken in a neighbouring state, in a case where a question analogous to that now under consideration was determined by the court. *Yohe vs Barnet,* 1 *Binney,* 364.

The acts of assembly of this state have made provision for the partition of the estates of intestates by the courts of law, and also by the courts of equity. The courts of law are not merely invested with power to make partition; but the mode of proceeding in such cases is, in many respects, directed and specified. On the other hand the courts of equity are clothed with authority to make partition, and there is no specification of the *mode* in which they shall proceed, at least so far as regards this question now under consideration. In the case of *The State use of Rogers vs Krebs & others, (6 Harr. & Johns.* 31,) determined by the court of appeals at June term, 1823, it appeared that application had been made to a court of law to make partition of an intestate's estate, and in order to effect the division sought for, the estate was sold, and the purchase money paid into the hands of the commissioners, and the judicial proceeding at an end. The question was, whether the share of a *feme covert,* in that situation, should be considered as *real* or

*personal* property? The court of appeals recite that the "laws direct the commissioners, who have sold for cash, after the ratification of the sale, and the deduction of the expenses to be ascertained by the court, to divide justly the purchase money among the several persons interested, according to their respective titles to the estate; and when the estate is sold by the commissioners on a credit, bonds are to be taken by them for the purchase money, *to each representative respectively*, according to his or her proportional part of the net amount of sales." And then they declare their opinion to be, "that the mutation of her estate from real to personal, may be determined to be complete, when the commissioners' sale is *ratified* by the court, and the purchaser has *complied with the terms of it*, by paying the money, if the sale is for cash, or by giving bonds *to the representatives*, if the sale is on a credit. The bond passed to the wife by the purchaser is a *chose in action*, as is the money in the hands of the commissioners, if withheld from her; both liable to be sued for and recovered by the husband at his pleasure."

Hence it appears that the point of time when the partition was complete, and the estate and the nature of the property changed, was that, when the court had *finally* acted upon the case, and the proceeds were paid over, secured, or placed under the *entire control* of the husband, without being obliged to apply to a court of chancery to enable him to obtain possession of them. It may be regarded as a general rule, that a court of equity will, in all cases, carefully preserve the character or nature of the estate, so as to leave an infant or a *feme covert* in the unimpaired enjoyment of every right, privilege, or control over the property, which might have been exercised when, and in the shape in which it originally vested. As where the money of an infant is laid out in the purchase of land. It may be for the benefit of an infant, in many cases, that the money should be laid out in land, if he should live to become adult; but if he does not, it is a great prejudice to him, taking away his dominion, by the power of disposition he has over personal property, so long before he has it over real estate. The court, therefore, with reference to his situation, even during infancy, as to his powers over property, works the change, not to all

intents and purposes, but with this qualification, that if he lives he may take it as real estate, but without prejudice to his right over it during infancy as personal property. 1 *Madd. Ch.* 340. So, in this case, the court will continue, to the very last exercise of its authority, to consider this property as *Mary's* real estate; because to treat it as personalty would be virtually to make a transfer of it to her husband, and deprive her of her privilege of coming into this court and asking to have it secured to her separate use. *Attorney General vs Whorwood,* 1 *Ves.* 539. Co. *Litt.* 351, *a, (note* 1.) From these authorities, and from others of a similar nature which might be referred to, this principle is clear, that, whether the parties apply to a court of law, or to a court of equity, no change is produced by the mere operation of the judicial proceedings, either in the *character* of the estate, or in the *nature* of the property, in reference to the *rights and power* of its owner, until the tribunal has acted conclusively and definitively upon the case. But in this instance, although the sale has been long since made, the whole of the purchase money has not even yet been collected; and only a part of that which has been received has been distributed. Nothing definitive has been, or can even now be done. *Mary's* husband could not have received any part of the proceeds of this property without the express order of this court; because no right to it had been, by any act of the court, finally transferred to, and vested in him. If *Mary* had at any time, during her life, asked of this court to have secured the proceeds of her share, before they were paid over, to her separate use independently of her husband, her request could not have been refused. No conveyance for the land has yet been made by the trustee to the purchaser; and the conveyance has been expressly ordered to be withheld until the court is informed, that the whole of the purchase money had been paid. There is, then, much yet remaining to be done before this case can be finally closed; and consequently, so far, no final change has been wrought by the proceedings in this case in the character of the estate, or the nature of the property as *respects* the destination of *Mary's* share after her death. Since nothing having been vested in her husband, or placed under his control finally and independently of this court, except that portion of

the proceeds which had been actually paid to him before her death; all that now remains of *Mary's* share must descend and pass as her land would have done, of the nature of which it is, to *her* heirs, and not to the representatives of her husband.

The consequence of this conclusion is, that *John Leeds Kerr's* claim, founded on an assignment of a part of the contingent expectancy of *Mary's* husband, must be altogether rejected. But as to the introduction of claims of this sort, in this manner, I would observe, as a general rule, that the court will not allow a claim of this description, wholly distinct in its origin and merits from the principal case, to be thus introduced and decided, merely because the fund. out of which payment is claim ed, happens to be either in court, or about to be brought in. Because, in cases of this importance, concerning land, the proceedings of which are directed to be recorded, it is highly improper that they should be expensively and unnecessarily incumbered with any matter foreign to the immediate subject of the suit. There is no peculiar equitable ground upon which *Kerr's* claim can be brought into this case similar to that on which *Welch's* claim is rested; nor has he succeeded to an entire share, as is admitted to be the case of *Nicholson.* Therefore, on every account *Kerr's* claim must be rejected. There is another excrescence with which this case has been incumbered and disfigured that ought not to have been allowed; that is the injunction bill *(a.)* All, or the principal portion of the equity of that bill, was to be found in the proceedings of this case; this injunction, therefore, was not an *original*, but strictly and properly a proceeding auxiliary to this case with which its equity is so intimately interwoven; and, consequently, should have been obtained by a concise petition, and not by a distinct original bill.

The share of *John Ball*, the grandson of the intestate, descended to his daughter *Elizabeth Ann Ball*, incumbered with debt and dower; therefore, from her share, the claim of *Welch* must be first deducted, and from the remainder the dower of

*(a)* That injunction was obtained by *Nicholson*, the purchaser of the land from *T. Williams*, and one of the grounds was a claim of a credit to that portion of the money that *T. Williams* was entitled to, (who had transferred it to *Nicholson*,) out of the share that would have gone to Mrs. *Leadenham*, if alive.

*Elizabeth,* now the wife of *Samuel Jones,* must be next deducted. She appears to have been only eighteen years of age when her right to dower accrued; she will, therefore, according to the rule of the court, be allowed one sixth of the share her husband was entitled to; but as she has been so tardy and negligent in making her claim, she will be allowed no interest.

But as no final decree can be had in this case, until the court is furnished with an account of the amount due to each claimant, estimated upon the principles before laid down, the case must be referred to the auditor for that purpose. And he is directed to ascertain from the trustee the whole amount received by him, and the amount he has heretofore distributed; to state what has been paid to *Mary,* or her husband, before her death; that is, assuming from the proofs that her death happened before the 1st of June 1821; and after deducting that amount, together with that which has been upon similar principles distributed to the other heirs, the residue to be divided among the surviving heirs of the intestate, upon the principles before mentioned. *Nicholson* is to be considered as the assignee of the share of *Thomas;* and an account must be so stated as to show the real balance, if any, due on the judgment against *Nicholson.* And the injunction heretofore issued on his behalf shall be continued until the auditor has made his report, or further order.

The auditor made his report accordingly, and the chancellor passed a final decree directing how the balance of the proceeds, received or to be received, were to be distributed, &c. excluding the claim of the executor of *Leadenham* to any portion of such balance. From which decree the executor of *Leadenham* appealed to this court.

The cause was argued at the last June term, before BUCHANAN, Ch. J. and STEPHEN, ARCHER, and DORSEY, J.

*R. Johnson,* for the Appellant, referred to the act of 1819, ch, 144, *s.* 6. *The State use of Rogers vs Krebs, et al.* 6 *Harr. & Johns.* 31.

*Mitchell* and *Brewer,* jr. for the Appellees. They referred to the acts of 1785, *ch.* 72, *s.* 12, and 1798, *ch.* 101, *sub ch.* 5, *s.* 8. *Cooper's Plead.* 64 to 69. *Wright vs Morley,* 11 *Ves.*

13. *Stevens vs Richardson*, 6 *Harr. & Johns.* 156. *Jarrett's Lessee vs Cooley*, *Ib.* 258. *Wildman vs Wildman*, 9 *Ves.* 176. *Mitford vs Mitford*, *Ib.* 87. *Richards vs Chambers*, 10 *Ves.* 587. *Murray vs Ld. Elibank*, 13 *Ves.* 5. *Dunscomb vs Dunscomb*, 1 *Johns. Ch. Rep.* 510. *Genet vs Tallmadge*, *Ib.* 563. *Heygate vs Annesley*, 3 *Bro. Ch. Rep.* 362, *(note a.) Blount vs Bestland*, 5 *Ves.* 515, *(note* 1.) *Anonymous*, 3 *Atk.* 726, case 276. *Bond vs Simmons*, *Ib.* 21. *Pearson vs Brereton*, *Ib.* 72. 1 *Madd. Ch.* 269, 270, 380, 388. *Davidson vs Clayland*, 1 *Harr. & Johns.* 546.

*R. Johnson*, in reply, referred to the act of 1802, *ch.* 94, *s.* 6. *Heygate vs Annesley*, 3 *Bro. Ch. Rep.* 362, *(notes.) Murray vs Ld. Elibank*, 13 *Ves.* 5.

*Curia adv. vult.*

DORSEY, J. at this term delivered the opinion of the Court. In May 1816, *Thomas* and *Joseph Williams*, *Gassaway Knighton*, and *Sarah* his wife, and *Edward Leadenham*, and *Mary* his wife, exhibited their bill in chancery against *Elizabeth Ann Ball*, setting forth that a certain *Joseph Williams* died intestate and seized of about 175 acres of land in *Anne-Arundel* county, leaving the said complainants, *Thomas*, *Joseph*, *Mary* and *Sarah*, and a certain *Ann Bird*, the wife of *John Bird*, his children, and a grandson named *John Ball*, the son of a deceased daughter *Elizabeth*, his heirs, to whom the said land descended. That *John Bird* died intestate and without issue; and that *John Ball* had also departed this life, leaving a child named *Elizabeth Ann Ball*, a minor, to whom his interest in said land descended. The bill further stated, that the land could not be divided beneficially to all concerned, and prayed for a decree for sale or division. In August 1816 the answer of the minor was filed, assenting to a sale of the land, and on the 31st of the same month, a decree for the sale passed, in the usual form, on a credit of twelve months, the purchaser to give bond with security, bearing interest. In January 1817, the trustee reported the sale of the land in the preceding November for $7350, to *Thomas Williams*, who had given bond for the purchase money agreeably to the decree. Which report was finally ratified by the chancellor in

March 1817. In September 1818, the auditor stated the account, &c. and distributed the proceeds of sale, after deducting the expenses, into five shares of $1440 91 each, to *Thomas Williams, Joseph Williams, Knighton* and wife, *Leadenham* and wife, and *Elizabeth Anne Ball;* on which account no order appears to have been taken by the chancellor. In November 1820, the auditor stated a second account, distributing $3000 received of the proceeds of sale, among the same distributees named in his first account, which was paid to them accordingly. On the first of June 1824, the auditor stated a third account, distributing in like manner $5185 78, except that of *Leadenham* and wife's proportion $120 was allowed to *John Leeds Kerr,* on an order drawn by *Edward Leadenham* on the 27th of January 1820. Which third account was, in common form ratified by the chancellor on the 7th of June 1824, and on the same day he rescinded the order of ratification as far as respects the distributive share of *Leadenham* and wife. On the 16th of the ensuing July, *Noah Leadenham* filed his petition in the court of chancery, setting forth all the proceedings in that court under the bill filed as aforementioned, and that judgments were recovered by the trustee against the principal and his securities, on the bond given for the purchase money of the land in 1819, and that previously thereto *Thomas Williams,* the purchaser, transferred to *Joseph* and *James Nicholson,* his securities, all his right of purchase in said land, and released to them his right to one-fifth part of the said purchase money. That *Joseph* and *James Nicholson,* to secure the payment of said purchase money to the trustee, assigned to him the single bill of a certain *Walter Claggett,* for $6453, on which the trustee recovered judgment in 1822, and upon a *fieri facias* issued thereon, received $5185 78, the sum of money on the distribution of which the present controversy arises. The petition also stating and establishing by accompanying depositions that *Mary Leadenham* died in February 1821, and *Edward Leadenham,* her husband, in August following; the prayer of the petition was that the chancellor would pass an order directing the trustee to pay to the petitioner, as executor of *Edward Leadenham,* the amount to which *Edward Leadenham* was entitled; and for general relief.

The principal question in this cause, and that from the chancellor's decision of which the present appeal hath originated, is simply this—Does *Mary Leadenham's* share of the aforesaid $5185 78 vest in the executor of her husband, or survive to her representatives? In the solution of this question, the first point to be examined is, what was the nature of *Mary Leadenham's* interest in the fund in controversy, at the time of her death? Was it realty or was it personalty? If the former, then *Edward Leadenham*, never having had issue by his wife, had not even the shadow of a claim, and the fund descended to the heirs at law of the wife. This was the opinion of the chancellor. In support of which the counsel for the appellees have referred to many cases, arising under a well established rule in equity, that money directed to be laid out in land will, before investment, be considered as land; and land, directed to be sold and converted into money, will before a sale, be considered as money, and pass as such.

The applicability of the authorities cited has not been discovered; this case not being embraced by either bra ch of the rule. It is not money, ordered to be invested in land, but money arising from land sold; and is, therefore, free from the operation of the first part of the rule. And if, contrary to the fact, it be conceded to be land to be converted into money, the latter part of the rule repudiates the idea of its being viewed as land, and stamps upon it a personal character. The case of *Yohe vs Barnet's Adm'r*. 1 *Binney*, 358, referred to in the chancellor's decretal order, is a very strong adjudication to prove that *Mary Leadenham's* interest was merely personal. But this principle has been settled by this court in the case of *The State use of Rogers vs Krebs, et al. Garnishees of Horne*, 5 *Harr & Johns*. 31, in which it became necessary to decide at what time a change took place in the nature of the real estate of a *feme covert* sold by commissioners appointed under the act to direct descents. And after great deliberation it was adjudged, "that the mutation of her estate from real to personal may be determined to be complete, when the commissioners' sale is ratified by the court, and the purchaser has complied with the terms of it, by paying the money, if the sale is for cash, or by giving bonds to the representatives, if the sale

is on a credit." It is true this was a decision at law; but it violates no rule or principle of equity; nor does any sound rea-son appear why, in cases like the present. the same rule should not prevail in equity, which exists at law.    We therefore disa-gree with the chancellor in considering *Mary Leadenham's* share "as her land," descending "to her heirs."    Nor can we admit that the determination of this cause must depend upon the effect which the proceedings of the court of chancery may have had in changing the nature of the estate of *Mary.*    The appellant has no claim to it, whether it be considered as real or as personal property.

The interest of *Mary,* at the time of her death, is viewed by this court in the nature of an equitable *chose in action,* for the payment of which to husband and wife, or either of them, no order was passed by the chancellor; for the recovery of which nothing has been done to entitle the representatives of the husband to claim under the act of assembly, or otherwise; it therefore survives to the personal representatives of *Mary Leadenham,* and not to her heirs at law, as decreed by the chancellor.

To show the extent to which the rights of the husband are carried in a court of equity, the note to the case of *Heygate vs Annesley,* 3 *Bro. Ch. Rep:* 362, has been referred to, which note professing to give the decision in *Forbes vs Phipps,* 1 *Eden,* 502, states it to have been there decided, that "where a *feme covert,* being entitled to a share of the residue of a testa-tor's estate, upon a bill filed by another residuary legatee, to which she and her husband were defendants, a decree had been made for a sale of the estate and payment, Lord *Northington* held, that the share vested absolutely in the husband by the de-cree, and that the wife surviving was not entitled."    How the learned annotator, in extracting the principle of a deci-sion reported by himself, could have so egregiously erred in his statement both of law and fact, it is difficult to conceive. The case of *Forbes vs Phipps* was not, (as it would appear to be by the above mentioned note,) a contest between the sur-viving wife and the representatives of the husband, but be-tween the surviving husband and the representatives of the wife; and the decree was, according to all the authorities both

at law and in equity, that the surviving husband was absolutely entitled.

The provisions of the act of assembly 1798, *ch.* 101, *sub. ch.* 5, *s.* 8, although introduced into the argument, can be of no avail to the appellant, as *Edward Leadenham*, after his wife's death, neither reduced her *chose in action* into possession, nor obtained judgment thereon. Independently of this act of assembly the executor of the surviving husband has not a shadow of claim. 'Tis true a decree has passed, in the lifetime of the wife, for the sale of her land, in a cause to which she and her husband were parties. But that proceeding directs a sale of the property, and the proceeds to be brought into court. It professes not to ascertain the rights of the respective claimants; it makes no distribution; it awards no payment, either immediately or contingently, to husband and wife, or either of them; no such decree has passed as is equivalent to a judgment at law, which would vest the chose of the wife absolutely in the surviving husband. If the decree had directed the proceeds of sale to be paid to the husband and wife, or the husband alone; or if the chancellor had made the usual order of ratification of the auditor's statement, directing the trustee to pay over accordingly, then would the representatives of the husband have been clearly entitled. But this has not been done.

Several questions of law, as to the form of proceeding, the regularity of the appeal, and the admissibility of testimony, were raised by the appellees, which our opinion on the main question renders it unnecessary to decide.

As to that part of the litigated fund which was assigned to *John Leeds Kerr*, the allowance of which by the auditor was rejected by the chancellor, this court can make no decree, *Kerr* being no party before us. Nor are we authorised to reverse the chancellor's decree as to the residue of that fund, the personal representatives of *Mary Leadenham* not appearing as appellants, and the executor of *Edward Leadenham* having no interest in the subject matter. We can therefore only do what the chancellor, according to our view of the case, ought to have done, with respect to the appellant's petition—decree its dismissal, with costs. *Decreed,* that the appeal be dismiss-

ed, and that the petition of the appellant in the court of chancery be also dismissed, with costs, &c.

APPEAL DISMISSED, &c.