DIXON GOUGH, ADM'R OF
MARY CRANE,
vs.
ROBERT CRANE AND JOHN A. CRANE,
EX'RS OF GEO. CRANE.

MARCH TERM, 1852.

[CHOSES IN ACTION OF THE WIFE — PART PERFORMANCE OF PAROL ANTE-
NUPTIAL CONTRACT — SPECIFIC PERFORMANCE — JURISDICTION OF EQUITY TO
DECREE DELIVERY OF BONDS TO THE REPRESENTATIVE OF THE WIFE.]

WHERE the husband neither reduces the *choses in action* of the wife into pos-
session during coverture, nor during his life in case he survives her, they
devolve at his death upon her representatives.

The Act of 1798, ch. 101, sub. ch. 5, sec. 8, changes in this respect the Eng-
lish statute of distributions, which gives to the representatives of the
husband who survives his wife, *choses in action* not reduced to possession,
to the exclusion of the representatives of the wife.

If the husband reduces the *choses in action* of his wife into possession during
his lifetime, or recovers judgment upon them at law or in equity, either in
his own favor or in favor of himself and his wife, and he survives her, and
subsequently dies, they devolve upon his representatives.

Where the marriage itself is the only act of performance of a parol ante-
nuptial agreement, that the *choses in action* of the wife should, in considera-
tion of the marriage, become the property of the husband, if the agreement
remains unexecuted, a Court of Equity has no power to decree its specific
performance in opposition to the statute of frauds.

Marriage itself, standing alone, is no part performance within the statute of
frauds.

A parol agreement made in consideration of marriage is founded on a valu-
able consideration, and upon consummation of the marriage and delivery
of the property in pursuance of the agreement, the case is taken out of
the operation of the statute, and will be enforced in equity.

The circumstances of this case are distinguishable from those of the case of
*Dugan et al.* vs. *Gittings et al.*, 3 *Gill*, 138, in essential particulars; there
being here no legal testimony of mutual promises to marry, and none to
bind the husband to the terms of the agreement as stated by the wife, and
no clear evidence that the property was delivered in pursuance of the
agreement.

Declarations of the lady made in the absence of the intended husband are
not admissible to prove the agreement to marry.

Declarations of the lady made in the absence and out of the hearing of the
intended husband, to the effect that they had made an agreement, that the
husband was to "have all her bonds" and "to allow her the interest on
them during her life," are not admissible to bind the husband.

To take a case out of the statute of frauds on the ground of part performance, the plaintiff must make out by clear and satisfactory proof the existence of the contract as charged in the bill, and the act of part performance must be of the identical contract set up by him.

The disinclination of Courts to make further inroads upon the statute, by excepting cases from its operation, is apparent in all the recent cases, and a firm determination exists to make no further relaxation of it.

Where a party is defending himself against the specific execution of a written contract, grounds of defence will be open to him which would not avail him if he as plaintiff were asking the aid of the Court.

Chancery, when called upon to coerce the specific performance of contracts, acts with less restraint than when exercising its ordinary jurisdiction, and will not interfere unless satisfied that the application is fair, just, and reasonable in all respects.

Where the representatives of the wife are asking a Court of Equity to direct the representatives of the husband, to deliver over to them the *choses in action* of the wife not reduced into possession by the husband in his lifetime, and the defence taken is part performance of a parol ante-nuptial agreement, the defendants should be held to the same clear, definite, and unequivocal proof of the contract set up in the answer, as if they were plaintiffs asking for its specific performance.

In this state a Court of Equity will receive parol proof to reform a written contract, so as to make it correspond with the real intention of the parties and then decree its specific execution.

But where the contract is by parol no matter if the intention of the parties was ever so clearly expressed, it would still be void for want of writing, and no reformation of it by a Court of Equity can make it otherwise.

The fact that an objection to the jurisdiction of the Court is not made until the hearing of the cause and after the argument was commenced, though not of itself a sufficient reason for refusing altogether to listen to it, yet in a case where there is doubt upon the question of jurisdiction, is a reason why the Court should lean against the objection.

In this case the Chancellor decreed the delivery up of the *choses in action* of the wife, not reduced into possession by the husband in his lifetime, to the representative of the wife, he being of opinion that it was not clear that there was plain, adequate, and complete remedy at law, and the objection to the jurisdiction not having been made until the hearing.

An action of trover would have given the plaintiff damages only from the demand and refusal, and this would be but a personal demand against the defendants, the executors of the husband, a security which may be much inferior to a decree directing the specific delivery of the bonds.

An action of replevin would require the representative of the wife to give bond with surety for a large sum, and the defendants, by a *retorno habendo* bond, would be able to regain the possession, and the plaintiff's claim to the specific thing thus converted to a personal demand on such bond.

Though the Act of 1841, ch. 168, does not apply to the Court of Chancery, or require objections to the jurisdiction to be made at any particular stage of the case, yet its policy and the manifest justice of the provision, may have influence when a question not free from difficulty is presented.

[The bill in this case was filed on the 19th of December, 1849, by the administrator of Mary Crane, against the executors of her late husband, George Crane. It alleges that the said Mary, then Mary Gough, intermarried with the said George some four years since; that at the time of her intermarriage she held, in her own right, certain bonds for moneys due to her by sundry persons; that after her intermarriage she died, leaving her husband, the said George, surviving her, who has since died, leaving the defendants his executors. That neither before the marriage were the said bonds assigned to the said George Crane, nor during the marriage were said bonds ever assigned or their character changed, nor were they reduced into possession during the life of said George, or judgments obtained upon them; but remained after his death unchanged, executed in the name of the said Mary Gough, unendorsed, unassigned, and in the same condition in which they were at the period of the marriage. That after the death of the said George, his executors took possession of said bonds, and returned and filed the originals thereof in the Orphans' Court of St. Mary's County, and copies of them are made exhibits. That letters of administration on the estate of Mary Crane were granted to complainant on the 13th of December, 1849. That as such administrator he is entitled to take and receive the proceeds of the said bonds, for the use of the legal representatives and distributees of the said Mary, the said George never having in his lifetime either reduced them into possession or recovered judgments thereon; and as such administrator he has demanded to receive them of the executors of said George, who have refused to deliver them over until the right to them shall have been decided. Wherefore, in order that complete and speedy adjustment of the respective claims may be had, and said bonds conveyed to the parties entitled to receive them, the bill prays for a subpœna, &c., and for an order directing

the defendants, as executors of said George Crane, to pay over and deliver to the complainant, as administrator of the said Mary, the said bonds, to be by him recovered and collected for the benefit of her representatives and distributees, and for general relief.

The answer of the executors, filed on the 28th of March, 1850, admits the intermarriage and death of the husband and wife, their appointment as executors of the husband, and the grant of letters testamentary to them, as well as letters of administration on the estate of the wife, as charged in the bill, and then states that they found among the papers of their testator certain bonds for a large sum of money, copies of which are filed with the bill; said bonds are for the amounts specified in said copies, and are drawn in favor of Mary Gough and her assigns, and so far as respondents know have not been paid, except insomuch as shown by the credits thereon, nor have judgments been obtained upon them.    But these respondents aver and allege, that prior to the intermarriage between the said George Crane and the said Mary Gough, the said bonds were, in consideration of the marriage which was about to be solemnized between them, and which did take place on the 3d of September, 1846, given by the said Mary Gough to the said George Crane, and that in accordance to said gift and agreement, the said bonds were delivered to the said George Crane, and remained in his possession up to the time of his death, which happened in August, 1849.

And these respondents also aver that the said bonds, in consideration of the approaching marriage between the said George Crane and the said Mary Gough, and which said marriage did take place at the time aforesaid, were by the agreement of the said Mary Gough with the said George Crane to become the property of the said George Crane at the time of his intermarriage with her, and that in consequence of said agreement and the said marriage, the said bonds came into the possession and did become the property of the said George Crane, and that these respondents, as his executors, are now entitled to have and receive the proceeds of them as a part of

the personal estate of their testator. That the original bonds have been filed for safe keeping in the office of the register of wills of St. Mary's County, and they have refused to deliver them to the complainant until the right, if any he has, is determined in the premises.

These respondents, therefore, believing and having been advised that they have a right to said bonds, and that they are entitled to receive as executors as aforesaid the proceeds of the same, pray the Court to decree accordingly, and that the complainant, as administrator as aforesaid, be ordered and directed to endorse said bonds to respondents, so that they may be enabled to proceed at common law to recover the amounts due upon them from the respective obligors; and to pass such decree in the premises for the full and entire settlement of the matter and relief of respondents as may be just and equitable, and decree to them their reasonable costs, &c.

On the 22d of June, 1850, by agreement of parties the general replication was entered, and a commission issued to take testimony.

Under this commission, returned on the 4th of January, 1851, it was proved on the part of the defendants, by Mrs. Sarah Drury, a competent witness, that about three weeks before Mrs. Gough's marriage to Colonel Crane, the latter remained all night at the house of a Mrs. Smith, where Mrs. Gough was staying, and Mrs. Gough came into Mrs. Smith's room, and said to Mrs. Smith and witness that she and Colonel Crane had made a bargain. Witness asked her what the bargain was. Mrs. Gough replied, that she had given all her notes for her money to Colonel Crane, and he promised to give her the interest of them as long as she lived, and that she had said to him, " Colonel, you know that when I die it is all yours." Witness has often heard Mrs. Gough declare, before her marriage to Colonel Crane, that she wished no one to have her property except Colonel Crane and his children. That Mrs. Gough, during the same conversation detailed above, observed that she and Colonel Crane were going to be married in a few weeks, and they were married shortly thereafter.

In answer to a cross-interrogatory by complainant, whether, when Mrs. Gough spoke of giving up her notes to Colonel Crane, she did or not state that it was a part of the bargain she spoke of, that she was to give up the notes to Colonel Crane upon her marriage with him, and he was after that to allow her the interest of them, witness replied:—Mrs. Gough said she had given up the notes to Colonel Crane, and he was to allow her the interest of them as long as she lived; and that she and Colonel Crane were going to be married, and she wanted no one else to have her property except Colonel Crane or his children. In answer to another cross-interrogatory, Do you know in whose possession the notes Mrs. Gough spoke of were up to the time of her marriage? if yea, state how you know it, witness replied:—In her own possession, and that a day or two before the conversation before spoken of, Mrs. Gough stated to Mrs. Smith, in my presence, that she held the notes in her own possession, (here defendant's counsel objected to the answer of the witness,) and that she meant to keep them until her marriage with Colonel Crane. Witness further stated, that she knew nothing about the engagement of the parties to be married before the time of the conversation first above spoken of.

Doctor C. M. Jones, one of the obligors in the bonds spoken of, proved that Colonel Crane called upon deponent shortly after the death of Mrs. Crane, for the payment of his notes or bonds, and that he did subsequently pay to Colonel Crane interest and a portion of the principal, as will appear by reference to said notes or bonds. And further, that when Colonel Crane called upon him for such payment, he, Colonel Crane stated that the notes or bonds were his property, and unless deponent agreed to pay him, he would bring suit against deponent at the ensuing March Court for the recovery of the same.

Doctor J. M. Broome, also an obligor in one of the bonds, proved that shortly after the death of Mrs. Crane, Colonel Crane called upon deponent for the payment of a part of his bond, which had been given to Mrs. Mary Gough before her

marriage with Colonel Crane, and that he, Colonel Crane, claimed said bond as his property.

Doctor Randolph Jones proved that on one occasion Mrs. Gough, before her marriage with Colonel Crane, came to deponent's house, when deponent tendered her payment of a note which she held against him, which payment she refused, stating that she was shortly to be married to Colonel George Crane: that there was an agreement between her and Colonel Crane, that he, Colonel Crane, was to have all her bonds and notes, and that he was going to allow her the interest of them for pin money. This was about three weeks prior to her marriage to Colonel Crane; and that they were married about three weeks after this conversation. In answer to an additional interrogatory by defendants, whether he had any conversation with Mrs. Crane subsequent to her marriage, and what it was, this deponent stated that he had a conversation with her the second or third day after her marriage, in which she referred to a locket she then wore, stating that that locket was all the property she then had; that she had given her notes and negroes to the Colonel, meaning Colonel Crane, to whom she pointed, and that she would be no longer subject to the harassments of collecting money and hiring out negroes. She also stated that she had no relations that cared for her, and that she had rather that Colonel Crane's children should have her property than any one she knew of. To another interrogatory, whether deponent had any conversation with one Mark Ford, now dead, relative to the delivery of certain papers to Colonel Crane in his presence by Mrs. Crane, and what it was? Witness replied, he had. Mark Ford is dead. He stated to me before his death, on the day after the marriage of Colonel Crane with Mrs. Gough, when he came to me in my field, that he had witnessed the marriage of Colonel Crane with Mrs. Gough. And that he further remarked to witness, that "Old Crane was worth ten thousand dollars more now than he was this time yesterday morning." Witness asked him how he knew? He replied; "I have just seen Mrs. Crane (the bride) give to Colonel Crane a bundle of papers, saying, 'Colonel,

this is your property;' and that a portion of the said papers were in the handwriting of Mr. B. G. Harris." Witness knew, of his own knowledge, that the notes given by Dr. C. M. Jones, his father, were in the handwriting of said Harris.

The complainant then, on the 4th of November, 1851, filed exceptions to this testimony. 1st. To the testimony of Mrs. Sarah Drury, because it only tends to prove a parol agreement never executed. 2d. To that of Drs. C. M. Jones and Broome, because it details conversations and statements of defendant's testator out of the presence and hearing of the complainant or his intestate. 3d. To the testimony of Dr. R. M. Jones, so far as it relates to information derived from Mark Ford, because it is evidence of the declarations of a third party, made out of the presence of complainant and his intestate. 4th. To the entire testimony of said Jones, relating to his conversations with Mrs. Gough before her marriage, because it only tends to establish a parol agreement unexecuted; and 5th. To the testimony of said Jones, relating to his conversation with Mrs. Crane after her marriage, because it is only of declarations made by complainant's intestate after marriage, and not necessarily tending to prove any ante-nuptial agreement.

The cause came on for hearing at March Term, 1852, and after the argument was commenced, the defendants filed the following exception.

" The defendants in this case except and object to the jurisdiction of the Court in this case to grant any relief to the complainant by his bill filed in this case, because he hath complete remedy at law for all the rights he sets up in the bill."

On the 23d of March, 1852, the Chancellor passed a decree, directing the defendants to deliver up the bonds in controversy to the complainant; accompanying which he delivered the following opinion :]

THE CHANCELLOR :

Putting aside the ante-nuptial agreement set up by the answer, it is perfectly clear that the securities which form the

subject of the controversy, are the property of the complainant as administrator of Mary Crane.

These securities consist of certain sealed notes which were given to and held by Mary Crane, then Mary Gough, prior to her intermarriage with George Crane, the testator of the defendants; and though by the marriage they devolved upon him *jure mariti*, and he might have reduced them to possession during their joint lives or after her death, he surviving her, and thus made them his property, yet, having failed to do so, or to recover judgment upon them, or to alter the security, they, according to our Act of Assembly, upon his death, devolved upon her representative. Act of 1798, ch. 101, sub. ch. 5, sec. 8. The Act of Assembly of this State changing in this respect the rule founded upon the English statute of distributions, which gives to the representatives of the husband who survived his wife, her *choses in action* not reduced to possession to the exclusion of the representatives of the wife. 2 *Kent's Com.*, 136. If, to be sure, the husband in his lifetime had reduced these *choses in action* to possession, or had obtained judgment upon them at law, or in equity, either in his own favor or in favor of himself and his wife, and he had survived her, his representatives, he subsequently dying, would have been entitled; but as he did neither, and the securities remained unchanged, and as they were originally her property, her representatives are entitled to them. *Leadenham* vs. *Nicholson*, 1 *H. & G.*, 267.

All this is quite plain and undisputed, but the answer in this case takes the ground, and counsel have urged in argument that the *ante-nuptial* contract, which it is insisted was made between Mr. and Mrs. Crane, has entirely changed the relative rights of the parties. And that in virtue of that agreement, these securities, it is said, now belong to, and should be recovered and enjoyed by the representatives of the husband.

The answer, after admitting the facts stated in the bill, alleges, "that prior to the marriage between the parties, the said bonds were in consideration of the marriage which was about to be solemnized between them, and which did take place on the 3d of September, 1846, given by the said Mary Gough

to the said George Crane, and that in accordance with said gift and agreement, the said bonds were delivered to the said George Crane, and remained in his possession up to the time of his death, in August, 1849." Again, " that the said bonds in consideration of the approaching marriage between the said George Crane and Mary Gough, and which said marriage did take place at the time aforesaid, were, by the agreement of the said Mary Gough with said George Crane, to become the property of the said George Crane at the time of his intermarriage with her, and that in consequence of said agreement, and the said marriage, the said bonds came into the possession and did become the property of the said George Crane, and that respondents, as his executors, are now entitled to them."

The defence, therefore, assuming that the objection to the jurisdiction of the Court is not well taken, is put upon the ground of an *ante-nuptial* agreement, by which it is alleged that these *choses in action* became upon the marriage the absolute property of the husband, and now should pass to his representatives.

The agreement relied upon in the answer not being in writing, cannot be set up as an objection to the title of the plaintiff unless there is something in the circumstances of the case which will relieve it from the operation of the statute of frauds, which declares that no action shall be brought whereby to charge to any person upon any agreement made in consideration of marriage, unless the agreement, or some memorandum or note thereof, shall be in writing and signed by the party, &c.

The circumstances relied upon here to save this case from the operation of the statute is part performance, and this part performance is the marriage itself and delivery of the bonds to the husband, those being the acts of performance set up in the answer. But it is clear and incontestable that the marriage itself standing alone is no part performance within this clause of the statute for reasons which are strongly stated in the case of *Moutacute* vs. *Maxwell*, 1 *Peere Wms.*, 618. In that case it will be found that the circumstances supporting the promise which was made by the intended husband to the wife to allow

her to enjoy her own estate to her separate use, were infinitely stronger than any which exist in this, and yet the Lord Chancellor held the plea of the statute good, and refused to enforce the agreement, and though subsequently, and when by an amended bill circumstances were stated from which it appeared that the agreement was designed to be reduced to writing, but this was prevented by the fraud of the husband, the Court overruled the plea and directed the defendant to answer, saying, that the fraud might entitle the plaintiff to relief, yet the doctrine, that if the parties rely wholly upon the parol agreement neither can compel the other to a specific performance is expressly reasserted; and it was also again declared, that if the marriage could be considered as an execution of the contract to take the case out of the statute, the clause in question would be a perfect nullity. 1 *Eq. Cases Abr.*, 19; *Prec. in Ch.*, 526; *Roberts on Frauds*, 196, 197, 198.

Supposing, therefore, that there was a parol contract between Mr. and Mrs. Crane prior to the marriage that these moneyed securities should in consideration of marriage become the property of the husband, and that the only act of performance is the marriage itself, it is clear upon authority, that if the agreement remains unexecuted, this Court has no power to decree its specific performance, in opposition to the statute of frauds. It is true, this is not a bill by the representatives of the husband asking the Court to decree an execution of this contract against the representatives of the wife, and resisted by them as an invasion of the statute of frauds, but to the bill of the representatives of the wife, praying to have these securities restored to them by the representatives of the husband the latter set up the parol agreement, which has been referred to, and seek protection under it; and the plaintiff, by exception, objects to this defence, and the testimony in support of it, upon the ground that it tends to establish an unexecuted parol agreement; and this, as it appears to me, presents the question whether the contract relied upon can be proved by parol in opposition to the statute of frauds. It is undeniable, as has been already said, that upon our statute, and upon the

decision of our courts, the right of property is in the plaintiffs, and that a Court having jurisdiction of the subject would be required to restore them to their possession, unless some valid contract is shown by which the rule of law is changed.

It is urged, however, that not only did the marriage take place pursuant to the contract, but the intended husband was put in possession of the securities, and held them until the period of his death, in 1849; and the case of *Duvall et al.* vs. *Gittings et al.*, 3 *Gill*, 138, is relied upon as showing that these circumstances are sufficient to take the case out of the statute. That case undoubtedly does prove that an agreement by parol made by a father with his daughter in consideration of her marriage, and as a marriage endowment, is founded on a valuable consideration, and that upon the consummation of the marriage, and the delivery of the possession of the property to the daughter, the case is taken out of the operation of the statute, and will be enforced in equity. In the case of *Cannel* vs. *Buckle*, 2 *Peere Wms.*, 243, it was held by Lord Macclesfield, that a bond given by a woman to her intended husband, that in case of their marriage she would convey her land to him, would, after the marriage, be enforced in equity, though the bond is void at law, and this case is cited with approbation by Mr. Justice Story. 2 *Story's Eq.*, sec. 739. The case of *Acton* vs. *Peirce*, 2 *Vernon*, 480, is to the same effect, and proves that a bond given to the wife by the husband before marriage, to leave her one thousand pounds, though extinguished at law by the marriage, will be enforced in equity, and numerous cases cited in the notes confirm this position.

Considering, therefore, the agreement as resting upon a valuable consideration, and that if in writing it would be enforced in a Court of Equity, and though unlike in some essential features, the case of *Dugan* vs. *Gittings*, it might be extricated from the operation of the statute of frauds if attended with some other circumstances which existed in that case, it remains to be seen whether the circumstances are the same in substance, because if substantially the same, a difference in detail or particulars cannot vary the principle applicable to them.

In the case of *Dugan* vs. *Gittings*, there was not a shadow of doubt of the agreement and the delivery of the possession of the property to the daughter in pursuance of the agreement. The Court speaks of the agreement to give in consideration of the marriage, and the delivery of the possession under the contract as being supported "by a mass of proof which it was impossible to resist." And they say that the performance of the consideration, and the change of possession under the contract are ingredients which, when combined, have always been regarded as relieving the parol agreement from the operation of the statute. But in this case there is no legal admissible testimony of mutual promises to marry, all the proof upon that subject being found in the declarations of the lady made in the absence of the husband, and it is only from the fact that the marriage did in fact take place shortly after the date of the conversations, that the agreement of the parties to be married can be inferred.

Conceding, however, that the circumstances are sufficiently strong to infer a mutual promise to marry, it is very clear that there is no evidence to bind the husband to the terms of the agreement, as stated by the wife to the witnesses. These terms were, that there was an agreement between her and Colonel Crane. "That he, Colonel Crane, was to have all her bonds and notes; and that he was going to allow her the interest of them for pin money." This is the proof of one witness. The other witness proves that Mrs. Gough said, "that she and Colonel Crane had made a bargain. Witness asked her what the bargain was; and she replied, that she had given all her notes for her money to Colonel Crane; and he promised to give her the interest of them as long as she lived." Now, with regard to this part of the contract, which is unquestionably very material, because it essentially impaired, if it existed, the marital rights of the husband, there is no proof whatever other than the declarations of the woman made in the absence and out of the hearing of the husband. And it cannot therefore be pretended that, if the positions of these parties were changed, and she was asking the Court to enforce the contract,

it could not be done.    And not only is there no proof that any such agreement was made by Colonel Crane, but there is no pretence that it ever was performed by him.    His right, or the right of his representatives to enforce this contract, rests exclusively upon the fact of the marriage and delivery of the bonds to him as asserted by the answer.    But the marriage, as we have seen, is no such part performance as will rescue the agreement from the operation of the statute; and an examination of the proof will show that the delivery of the possession of the bonds cannot be traced with any degree of certainty to the agreement relied upon in the answer.    It is certainly, to say the least, very doubtful, whether the securities were delivered to the husband prior to the marriage.    On the contrary, my impression is very decided that Mrs. Gough retained them in her own possession until after that event.    It is true, in her conversation with Mrs. Drury, which occurred about three weeks prior to the marriage, she says she *had* made a bargain and *had given* her notes to Colonel Crane; but making a bargain and giving do not always or necessarily infer the parting with the possession of the thing given; and upon cross-examination, the same witness expressly says: Mrs. Gough retained the notes in her own possession up to the time of the marriage.    And there is not a scintilla of evidence other than what has been mentioned above to prove the contrary.    That Colonel Crane should be in possession of the notes after the marriage, is of course consistent with the relations which then subsisted between them, and surely cannot be referred exclusively to the agreement.    After the marriage, unless there was some agreement to the contrary, she had no right to withhold them from him.

The proof in this case, therefore, falls far short of the evidence in that of *Dugan* vs. *Gittings*, and I entertain a strong conviction that if the husband or the husband's representatives were here as plaintiffs, asking this Court specifically to enforce the agreement, the application would be unsuccessful.

It has been repeatedly decided by this Court, and the principle is believed to be too firmly settled to be shaken or drawn

in question, that to take a case out of the statute of frauds on the ground of part performance, the plaintiff must make out, by clear and satisfactory proof, the existence of the contract as charged in the bill. And the act of part performance must be of the identical contract set up by him. *Owings* vs. *Baldwin and Wheeler*, 1 *Maryland Ch. Decisions*, 120, afterwards affirmed on appeal to the Court of Appeals; *Beard* vs. *Linthicum*, *ib.*, 345. It is impossible to dispute the principle, and the disinclination of the Courts to make further inroads upon the statute by excepting cases from its operation is apparent in all the recent cases. *Philips* vs. *Thompson*, 1 *Johns. Ch. Rep.*, 131; *Parkhurst* vs. *Van Cortlandt*, *ib.*, 284. The disposition is rather to retrace the steps which have been taken in what is now considered the wrong direction, but at all events, if this is not so, a firm determination exists to make no further relaxation of the statute.

It is quite true that in this case the representatives of the husband did not come into the Court asking it to interfere actively to compel the specific performance of the contract set up in their answer. They are here as defendants, and seek to defend themselves against the claim asserted in the bill, upon the ground of an agreement, by which they insist that the property in dispute belongs to their testator; and it is urged, that upon a principle recognised by this Court, they will not under such circumstances be required to exhibit as strong a case as would be required of them if they, as plaintiffs, were invoking the active interposition of the Court in their behalf. 2 *Story's Eq.*, secs. 769, 770, 771. If the plaintiff in this case was seeking to enforce the specific performance of a written contract against them, grounds of defence would be open in opposition to such application, which would not avail them if they as plaintiffs were asking the aid of the Court, because chancery when called upon to exert its extraordinary power to coerce the specific performance of contracts, acts with less restraint than when exercising its ordinary jurisdiction, and will not interfere, unless satisfied that the application is just and reasonable in all respects. *Waters* vs. *Howard*, 1 *Maryland*

*Ch. Decisions*, 112. In the exercise of a sound judicial discretion, the Court will not be active in specifically enforcing claims, not under the actual circumstances just between the parties, but will turn them over to another tribunal, where such damages may be awarded as in the estimation of a jury may be reasonable and proper. 2 *Story's Eq.*, sec. 770.

But in this case the plaintiff is not asking the Court to enforce the specific execution of a contract made by the original parties, nor are the defendants attempting to defend themselves against any such claim by proof that the granting of the application would be contrary to the principles of justice. No application is made to the Court for the execution of its extraordinary jurisdiction, when it may or may not interfere, in the exercise of a sound but not unlicensed discretion, and when, freeing itself from those strict rules which usually prevail in the administration of justice, it may look at circumstances which otherwise it would not be at liberty to consider, and ascertain whether the demand made upon it is fair and reasonable in all respects, and act or refuse to act accordingly.

The plaintiff is not here asking the Court to enforce a contract between these parties. He comes before the Court upon a clear and acknowledged title, not founded upon convention, but upon admitted law, and asks the Court to restore to him rights which by the law he is unquestionably entitled to. The defendants meet this demand by setting up a parol contract, which being by parol is void under the statute of frauds, and ask that they may be allowed to take shelter under it, because it has been in part performed. Now, it appears to me that under such circumstances, the defendants should be held to the same clear, definite, and unequivocal proof of the contract set up in the answer as would be required of them, if they, as plaintiffs, were asking for its specific performance. There surely is, in this case, no reason why the rule which requires that the identical contract laid in the bill shall be proved, when the operation of the statute of frauds is sought to be avoided upon the ground of part performance, because, being presented in the answer, the plaintiff is deprived of the opportunity which

he would enjoy of denying it upon oath if the relative position of the parties was changed.

It is said, however, that the proof makes out a clear case of intention, and that this Court has the power and will cure the defect, and execute the contract according to the intention of the parties. There can be no doubt in this state, that chancery will receive parol proof to reform a written contract so as to make it correspond with the real intention of the parties, and then decree its specific execution as rectified. *Moale* vs. *Buchanan*, 11 *G. & J.*, 314. Thus repudiating the doctrine that parol evidence of mistake could only be offered by the defendant to rebut an equity. But this is not a case in which parol evidence is offered to rectify a written contract upon the ground of fraud, surprise, or mistake. The contract here is by parol, and void; and if the intention of the parties was ever so clearly expressed, it would be no better. It would still be void for want of writing, and no reformation of it by this Court can make it otherwise. It follows, therefore, that in my opinion the defence cannot be maintained, and that the plaintiff must have relief if this Court has jurisdiction to give it to him.

The objection to the jurisdiction is for the first time taken at the hearing, and after the argument had commenced, and though I do not deem myself at liberty to disregard it on that ground, it certainly furnishes a reason for looking with some degree of disfavor upon it. Prior to the passage of the Act of 1841, ch. 163, an objection to the jurisdiction of this Court might be taken in the Court of Appeals, though the defendant had wholly omitted to place his defence upon that ground in the Chancery Court, so that it frequently happened that parties who had meritorious claims if prosecuted in the proper forum, lost them by having an exception to the jurisdiction sprung for the first time in the Appellate Court, when, if the objection should be sustained, limitations or loss of evidence would be fatal to a recovery upon being compelled to sue at law. The Act referred to was to cure this evil; and though it does not apply to this Court, or require the defendant to object to its jurisdiction at any particular stage of the cause,

its policy, and the manifest justice of the provision may be permitted to have some little influence when a question not free from doubt is presented. The Court was called upon in the case of *Hughes* vs. *Jones*, 2 *Maryland Ch. Decisions*, 179, to consider this subject, and it was then said, that if "the want of jurisdiction is apparent, the delay, and the circumstances under which the objection was made, must be disregarded, however severely it might operate; but if there be any doubt upon the subject, the Court may surely take these circumstances into consideration, and be induced by them to give unwilling heed to the objection." In this case, the answer rests the case upon the merits disclosed by it, and the general replication was entered, and a commission by consent of parties was issued to take proof more than two years ago. But in addition to this reason why the Court should not now lend a willing ear to the objection to its jurisdiction, it is by no means certain that the plaintiff has that plain, adequate, and complete remedy at law which should deny him the aid of Chancery.

The action of trover would only enable him to recover damages for the demand and refusal, and the plaintiff had no authority to make the demand until after he took out letters of administration in December, 1849, which would fall far short of his recovery under this bill if he succeeds in getting a decree. *Fishwick* vs. *Sewell*, 4 *H. & J.*, 394. Besides, in the action of trover, he recovers only damages against the defendants, giving him a personal demand against them, which it must be obvious may be a much inferior security, to a decree which shall direct a specific delivery of the bonds and notes to the complainant. If replevin is brought, the complainant must give bond with surety for a large sum of money, which in many cases may be extremely inconvenient, and in some impossible; besides, that it would be requiring of an administrator to assume a personal responsibility, which should not be lightly demanded of him. This circumstance, it will be seen, had some weight attached to it in the case of *Hughes* vs. *Jones*, already referred to. Besides, even if replevin were brought, and the notes under it delivered to the complainant, the defendant upon

giving a *retorno habendo* bond would have them restored to him, and his claim to the specific thing converted probably into a personal demand upon the bond in the event of his succeeding in the action.

In *White's Equity Cases,* 65, *Law Lib.,* 545, many cases are collected establishing the principle that a Court of Equity will decree a specific delivery up of deeds or writings to the persons legally entitled to them ; and in *Jackson* vs. *Butler,* 2 *Atk.,* 306, where mortgage deeds delivered to a person for the purpose of receiving the principal and interest due on them had been pawned by him, were decreed to be delivered up by the pawnee, Lord Hardwicke observing, that the plaintiff might have had an action of trover, but then he could only have had damages for the detaining, but not the deeds themselves, and therefore he was right in bringing a bill in equity for the recovery of his deeds.

Under all the circumstances of the case, therefore, I shall decree the specific delivery of these notes. It appears to me at least doubtful whether the plaintiff has that plain, adequate, and complete remedy at law which will preclude the interposition in his favor of this Court; and seeing that the objection was not made until after the argument of the cause had commenced, which, though not of itself a sufficient reason for refusing altogether to listen to it, is a reason why the Court should lean against it, and I am not disposed now to yield to it. But though the decree will be for the plaintiff, the costs will not be thrown upon the defendants, who in resisting the claim made upon them, acted in the proper discharge of their duty.

J. M. S. CAUSIN, for Plaintiff.
GEO. BRENT, for Defendants.

[An appeal was taken in this case, which is still pending.]